# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00607-COA

**JAQUARUS LASHAWN WHITE**                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/19/2022 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/10/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Jaquarus White appeals his Jones County Circuit Court conviction of armed robbery and resulting sentence of thirty-three years in the custody of the Mississippi Department of Corrections, with thirty years to serve and three years suspended, and three years of post-release supervision. On appeal, White raises a single issue: whether the circuit court erroneously admitted prior bad acts evidence that prejudiced the outcome of his case. Having considered the arguments of the parties and the relevant caselaw, we affirm.

## Facts

¶2.     At 1:30 a.m. on the morning of October 16, 2020, Justin Huddleston, who worked at

the Clark's Gas Station in Laurel, Mississippi, saw a white Toyota Camry pull up to a gas pump. A man wearing a Chicago Bulls shirt got out of the car, went in the store, and bought a Black & Mild cigar.

¶3.    A few hours later, the same white Toyota Camry returned. Shortly thereafter, a man wearing a blue and gray striped sweater and a black ski mask went into the store, brandishing a silver gun. The man pointed the gun at Huddleston and motioned toward the cash register. Huddleston put the money from the till (approximately $400) in a plastic bag and gave it to the man. Although the man was wearing a mask, Huddleston said he recognized him from his eyes as the man who had come into the store earlier.

¶4.    After the robber left, Huddleston locked the door and called the Laurel Police Department and his supervisor, LaRhonda Page. Officer Justin Clifton responded to the call and took Huddleston's statement. Page arrived as well. and they viewed the store's surveillance tape. Page and Huddleston recognized the man who had entered at 1:30 as a regular customer, but they did not know his name. Page knew the man had a twin sister and that his stepfather worked as a pressure-washer. The next day, Investigator Jamison Crabtree went to the store and retrieved the surveillance footage. Page told him that the employees recognized the suspect as a customer, but again no one knew his name.

¶5.    Over the next two days, Page asked different customers if they knew the suspect, and she finally learned White's name. She pulled up White's Facebook page and gave Investigator Crabtree the information she had gathered. When Lieutenant John Stringer came to the store following up on the robbery, Page shared this information with him as well.

2

¶6.     Meanwhile, that same day, as Huddleston was arriving at his home at the Shadowood Apartments, he saw the white Toyota Camry from the robbery. He took a picture of the license plate and called Page. Stringer was still at the store, and Page relayed this information to him. Stringer went to the apartments, saw the white Camry, and ran its tag. He learned the vehicle was registered to White. White was among several men standing by the car. When Stringer asked who owned the car, White said that he did, and Stringer arrested him. The car was towed and searched, but police found no evidence in it related to the robbery.

¶7.     After White signed a *Miranda* waiver,[1] Investigator Crabtree interrogated him on October 19, 2020. Crabtree later explained that although the interview was videotaped, the police department had issues with its computer system, and the tape was corrupted. Nonetheless, Crabtree testified that during the interrogation, White admitted that he was in Clark's at 1:30 a.m. as shown on the store surveillance video. White also admitted that he had robbed the store at 3:15 a.m. because his mother would not buy him any clothes.[2]

¶8.     White was released on bond on October 27, 2020, and shortly thereafter, on November 7, 2020, the Alliance Energy convenience store was robbed. White was arrested for that robbery and again waived his *Miranda* rights. During that custodial interrogation, White said that he did not rob Alliance but that he had robbed Clark's.

---

[1] Under *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), detainees are entitled to be advised of their rights to remain silent and be represented by counsel before law enforcement may interrogate them while in custody.

[2] Twenty-year-old White lived with his mother.

¶9.     On February 3, 2021, a Jones County grand jury indicted White for the Clark's armed robbery in violation of Mississippi Code Annotated section 97-3-79 (Rev. 2020).[3]   At White's arraignment on February 18, 2021, trial was set for August 26, 2021.  Because of COVID-19, the trial was reset for February 2, 2022.  White was separately indicted for the Alliance robbery under a different case number.

¶10.    Although the State provided discovery to White on February 17, 2021, nearly a year later, on January 3, 2022, the State informed White that it had failed to produce the videotape of White's interrogation after the Clark's robbery in which White allegedly confessed to the crime.  The State told White's attorney that the videotape of that interrogation had been irretrievably damaged and no longer existed.  At the same time, the State provided White the surveillance footage from Clark's that also had not been previously provided.  In his conference with the State, White's counsel also learned that the State intended to enter statements White had made during his interrogation in the investigation of the Alliance robbery.  In that interrogation, a videotape of which did exist, White admitted to robbing Clark's.

---

[3]  Section 97-3-79 provides:

Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery and, upon conviction, shall be imprisoned for life in the state penitentiary if the penalty is so fixed by the jury; and in cases where the jury fails to fix the penalty at imprisonment for life in the state penitentiary the court shall fix the penalty at imprisonment in the state penitentiary for any term not less than three (3) years.

¶11. Following these disclosures, on January 25, 2022, White filed a motion in limine to exclude both the store surveillance video and any testimony concerning statements White made during his interrogation concerning the Alliance robbery investigation. White also sought a continuance to allow him to adequately prepare to defend himself in light of these late disclosures. The circuit court heard both motions on January 26, 2022.

¶12. The State admitted that its disclosures were late, and as a result the circuit court continued the trial to April 13, 2022. During the motions hearing, the court also viewed the videotape of White's interrogation concerning the Alliance robbery. The court entered a separate order denying White's motion in limine and ruled that the admissions White made during that interrogation of his involvement in the Clark's store robbery were admissible.

¶13. The case was tried on April 18, 2022, and the jury heard Huddleston, Page, and law enforcement officers Clifton, Stringer, and Crabtree testify to the facts set out above. Over White's objection, the State was allowed to play Officer Clifton's body-camera video of his arrival at Clark's just after the robbery. The body-camera footage included Clifton's interview of Huddleston at the scene that night, in which the store clerk recounted what had happened. The court also admitted the Clark's store surveillance video showing the suspect robbing Huddleston at Clark's, as well as White's earlier entry into the store.

¶14. The State also played certain portions of White's interrogation for the Alliance robbery in which White admitted that he had robbed Clark's. Before showing this video to the jury, the circuit court gave the following limiting instruction:

> THE COURT: Let me give the jury this limiting instruction with regard to a separate investigation. You are not to consider any testimony or any evidence

5

regarding a separate investigation of a separate crime or separate alleged crime for the purpose of the State trying to prove that if he committed that crime, then he must have committed this crime. It's not to be used by you or considered by you for that purpose. The only purpose you are to consider is for - - is in regard to anything that defendant may say during this interview regarding this matter that is the subject of this trial today. Does everybody understand that instruction[?]

After the State rested and the court denied White's motion for directed verdict, White elected not to testify and presented no witnesses in his defense.

¶15. In its closing argument, the State pointed out, among other things, that the store surveillance video showed the robber's pants sagging, revealing blue plaid underwear. The State noted that the surveillance video also showed that White, who had gone into the store earlier that night to purchase a cigar, wore the same plaid underwear. During its deliberations, the jury asked to view the surveillance video again "to look at the underwear," and the court obliged. Because the jury did not have equipment in the jury room to view the videos, the court brought the jury into the courtroom and played the relevant portions of the surveillance video. After viewing the surveillance video, the jury further deliberated and then asked to view the interrogation video as well. Again, the court brought the jury into the courtroom and played portions of the interview video for the jury. The jury retired, deliberated further, and found White guilty of armed robbery. The circuit court sentenced White on that same day, April 19, 2022, to thirty-three years in the custody of the Mississippi Department of Corrections, with thirty years to serve and three years suspended, and three years of post-release supervision.

¶16. On April 28, 2022, White filed a motion for judgment notwithstanding the verdict or

for a new trial. In addition to arguing that the jury's verdict was not supported by the evidence, White contended that the circuit court erred by denying his motion in limine. White also claimed that the circuit court had erroneously overruled his objections to evidence, but he did not identify the specific objections or evidence to which he was referring. On May 2, 2022, the circuit court summarily denied White's post-trial motion. White filed his notice of appeal on June 10, 2022.[4]

¶17.    On appeal, White raises the sole issue of whether the circuit court erred in allowing into evidence the admissions of guilt for the Clark robbery that White made during his interrogation for the Alliance robbery. White asserts that this constituted inadmissible "prior bad acts" evidence that was more prejudicial than probative and warrants reversal of his conviction.

**Standard of Review**

¶18.    "The standard of review for admission of evidence is abuse of discretion." *Amos v. State*, 360 So. 3d 323, 330 (¶25) (Miss. Ct. App. 2023) (citing *Taylor v. State*, 330 So. 3d 758, 761 (¶7) (Miss. 2021)). "The relevancy and admissibility of evidence are within the discretion of the trial judge and will not be reversed unless that discretion has been abused." *Id*.

¶19.    When reviewing the court's exercise of discretion in admitting evidence, "we first

---

[4] Despite the date, White's appeal was timely filed because the circuit court granted him an extension. The circuit court had allowed White's trial counsel to withdraw and had appointed the Office of State Public Defender to represent White. On June 7, 2022, the Public Defender's Office filed a "Motion to Proceed on Appeal Out of Time" because it did not learn of its appointment to represent White until June 7, 2022. The circuit court granted the motion on June 8, 2022, and White appealed on June 10, 2022.

inquire whether the trial court applied the correct legal standard." *Griffin v. McKenney*, 877 So. 2d 425, 433 (¶22) (Miss. Ct. App. 2003). If the trial court applied the correct legal standard, we can only find it abused its discretion if our review of the record leads us to "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Id.*

**Discussion**

¶20. White argues that the evidence elicited during law enforcement's interrogation of him for the Alliance robbery was inadmissible because it constituted evidence of other bad acts, which he argues was prohibited under Mississippi Rule of Evidence 404(b)(1) and was more prejudicial than probative.

¶21. Relevant evidence is that which "has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the case." MRE 401. Although Rule 401 "favors the admission of evidence with any probative value at all," *Giles v. State*, 187 So. 3d 116, 123 (¶25) (Miss. 2016), under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." MRE 403.

¶22. The admission of evidence of a defendant's prior bad acts is further governed by Rule 404(b):

(b) Crimes, Wrongs, or Other Acts.

8

(1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

MRE 404(b). But "even if admissible, the court must weigh whether the probative value of the evidence of the other bad acts is substantially outweighed by the danger of unfair prejudice to the defendant." *Anderson v. State*, 354 So. 3d 411, 418 (¶21) (Miss. Ct. App. 2023); *accord* MRE 403. "If the [prior bad acts] evidence is determined to be more probative than prejudicial, it may be admitted, with the trial court's giving an instruction to the jury explaining the limited purposes for which the evidence may be considered." *Shell-Blackwell v. State*, 305 So. 3d 1211, 1219 (¶24) (Miss. Ct. App. 2020) (citing *Derouen v. State*, 994 So. 2d 748, 756 (¶20) (Miss. 2008)). However, even "if a trial court determines that the prejudicial effect of evidence substantially outweighs its probative value, it is *not obligated* to exclude the evidence, but *may* do so at its discretion." *Stone v. State*, 94 So. 3d 1078, 1085 (¶20) (Miss. 2012) (emphasis added); *accord Ross v. State*, 954 So. 2d 968, 993 (¶45) (Miss. 2007).

¶23.    At issue in this case are White's admissions that he was guilty of the Clark's robbery made during law enforcement's interrogation of him on the Alliance robbery. The circuit court found that these statements were admissible because White made them voluntarily and without coercion. "This Court will not reverse a trial court's finding that a confession was voluntary and admissible as long as the trial court applied the correct principles of law, and

the finding is factually supported by the evidence." *Pinter v. State*, 221 So. 3d 378, 387 (¶21) (Miss. Ct. App. 2017) (citing *Greenlee v. State*, 725 So. 2d 816, 825 (¶21) (Miss. 1998)). "Further, where there is conflicting evidence about a confession's admissibility, this Court 'will not disturb the trial court's finding unless it appears clearly contrary to the overwhelming weight of the evidence.'" *Id*. (quoting *Wiley v. State*, 465 So. 2d 318, 320 (Miss. 1985)).

¶24.    The circuit court denied White's motion to exclude these statements of guilt and cited *Odom v. State*, 769 So. 2d 189 (Miss. Ct. App. 2000), which we also find applicable. In that case, a jury convicted Odom of a murder that occurred in May 1978. *Id*. at 192 (¶2). The trial court granted him a new trial because the State had used too many preemptory challenges, but Odom chose to plead guilty. *Id.* Years later, in 1991, Odom escaped from jail, was arrested in Memphis, Tennessee, and charged with rape and murder. *Id*. at (¶3). During law enforcement's interrogation of Odom for that offense, Odom admitted to committing the 1978 murder in Mississippi. *Id*. at 196 (¶22). In 1994, Odom filed a petition for a writ of habeas corpus to set aside his Mississippi guilty plea for the 1978 murder, and the federal court granted his petition. *Id.* At his new trial, the State entered not only confessions Odom had given in the 1978 investigation but also Odom's 1991 confession that he made to Tennessee officials. *Id*. at 195 (¶15). In our decision on Odom's appeal of his conviction, we affirmed the trial court's finding that the probative value of Odom's 1991 confession in Tennessee outweighed any prejudice to Odom. *Id*. at 196 (¶22). We noted:

> Before ruling that a confession is voluntary, the trial judge must determine whether the accused, prior to his confession, understood (a) the content and

substance of the *Miranda* warnings and (b) the nature of the charges of which he was accused.

*Id*. at (¶19) (internal quotation marks omitted). We held that Odom's 1991 admissions to the 1978 murder were unequivocal, that the pre-requisites for voluntariness had been met, and there was no mention to the jury about the circumstances surrounding Tennessee's interrogation. *Id*. at (¶22).

¶25. Similarly, in this case, the jury was shown portions of the videotape of White's interrogation for the Alliance robbery in which White admitted to robbing Clark's. The record includes the videotape of the entire interrogation that the State entered into evidence. However, according to the trial transcript, only certain portions of the tape were played for the jury. We know they only watched those portions of the video that were played in open court, not the entire video of the interrogation, because the jury did not have the ability to watch videos in the jury room. The trial transcript indicates the starting times of the various segments, but it does not note the ending time, which makes it difficult for this Court to know exactly what the jury heard White and his interrogators say. However, White made no contemporaneous objection to any specific portion of the tape as it was being played, and he made no record of what was said in the portions shown that establishes his claims of prejudice or irrelevance. "[A]n appellant must present to us a record sufficient to show the occurrence of the error he asserts and also that the matter was properly presented to the [circuit] court and timely preserved." *Clayton v. State*, 271 So. 3d 672, 678 (¶25) (Miss. Ct. App. 2018) (citing *Byrom v. State*, 863 So. 2d 836, 853 (¶35) (Miss. 2003)).

¶26. The videotape clearly shows that at the beginning of the interrogation, White was

given his *Miranda* rights—the interrogator is heard on tape actually reading them to White. White signed a waiver with no coercion or promises made. In the segments of the videotape shown, White distinctly says that he had "pleaded guilty" to the Clark's robbery, meaning that he had previously admitted to law enforcement that he had robbed Clark's. When specifically asked if he had robbed Clark's, White admitted that he had, and he further admitted that he had used a gun in that robbery that he had borrowed from a friend. The video reflects that these statements were voluntary and not coerced in any way. Moreover, White's admissions were clearly probative and relevant to the issue of his guilt. *See Ragin v. State*, 724 So. 2d 901, 906 (¶21) (Miss. 1998) (holding that defendant's statement that he just smoked crack but did not sell it was relevant to his prosecution for sale of a controlled substance). Accordingly, we find no error by the circuit court in allowing portions of White's interrogation concerning the Alliance robbery as evidence in the case against White for the Clark's robbery.

¶27. White contends that the probative value of this evidence was outweighed by the prejudicial effect, arguing that the State could not present the video of the Alliance interrogation without informing the jury that White had been accused of and arrested for another burglary. However, the record reflects that the State did not tell the jury that White had been arrested for a second burglary. The State introduced the subject of a second interview by asking Investigator Crabtree the following:

> Q. Okay. Did you have any other occasion to speak to the defendant, not specifically in reference to this armed robbery?
>
> A. I did.

12

Q.    And was that an interview?

A.    It was an interview, and it was recorded.

Q.    Okay.

A.    That recording was able to be captured, and there was no issues with that interview.

Q.    Okay.  So just the same as the first time that you had occasion to interview him, did you offer the defendant his *Miranda* rights and ask him whether he intended to consent to being interviewed that day?

A.    I did.

Q.    And just the same, did he sign a waiver stating that he agreed to waive his rights and speak with you?

A.    Yes, he did.

There is no mention in this line of questioning that another crime had been committed.

White's *Miranda* waiver for that interrogation was entered.  That waiver contains no

information about the reason for the interrogation or the charge White was facing—nothing

to indicate to the jury that he was being charged with a different crime.  Out of an abundance

of caution, the circuit court promptly gave the jury a limiting instruction concerning the

relevance of the evidence.[5]  Moreover, White made no objections to what was shown to the

---

[5]  Before the tape was shown, the court gave the following instruction:

Let me give the jury this limiting instruction with regard to a separate investigation.  You are not to consider any testimony or any evidence regarding a separate investigation of a separate crime or separate alleged crime for the purpose of the State trying to prove that if he committed that crime, then he must have committed this crime.  It's not to be used by you or considered by you for that purpose.  The only purpose you are to consider [it] is for - - is in regard to anything that the defendant may say during this interview regarding this matter that is the subject of this trial today.  Does

jury. Consequently, because White's admissions of guilt as to the Clark's robbery were voluntarily made, they were without question probative. Since White points to nothing specific that was said in the Alliance interrogation that was prejudicial, we find no basis to disturb the circuit court's Rule 403 analysis.

**Conclusion**

¶28. Because White's admissions of guilt for the Clark's store robbery made during his interrogation for another robbery were freely and voluntarily made, and because we find no abuse of discretion in the circuit court's determination that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, we find no error in their admission, and we affirm White's conviction and sentence.

¶29. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

---

everybody understand that instruction[?]

(Affirmative responses.)

14